IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BRIAN PFALZGRAF,

                                    Plaintiff,                    OPINION and ORDER

    v.
                                                                 23-cv-877-jdp
BEN REISNER and RUSK COUNTY,

                                    Defendants.

This case arises out of a traffic stop that culminated in the arrest of plaintiff Brian Pfalzgraf for possession of methamphetamine.[1] Pfalzgraf concedes that the initial stop was lawful because his license plate was obstructed by snow. But Pfalzgraf contends that defendant Ben Reisner, a Rusk County Sheriff's Deputy, violated the Fourth Amendment three times: (1) by prolonging the stop without the required reasonable suspicion of illegal drug activity; (2) by frisking Pfalzgraf without reasonable suspicion that he was armed; and (3) by searching Pfalzgraf without probable cause. Although the final search found a small amount of methamphetamine and Pfalzgraf was arrested, the charges were dropped because of the prosecutor's concern over the legality of the stop and search.

Both sides move for summary judgment on the liability questions. Dkt. 16; Dkt. 10. The court concludes that Reisner violated Pfalzgraf's rights by extending the traffic stop and by frisking Reisner without reasonable suspicion that he was armed. But the court will deny both sides' motions for summary judgment on Pfalzgraf's claim that Reisner lacked probable

---

[1] Pfalzgraf has also named Rusk County has a defendant in this lawsuit for purposes of an indemnification claim under Wisconsin state law, but neither party moves for summary judgment on that claim.

cause for the final search. The legality of that search depends on whether Reisner's K-9 alerted to Pfalzgraf's vehicle, but whether the K-9 alerted in disputed. That claim will be resolved at trial, along with the question of damages for the violation of Pfalzgraf's rights. The court will deny the parties' joint motion to strike the trial date and pretrial deadlines.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

At approximately 12:30 am on January 26, 2021, plaintiff Brian Pfalzgraf was driving a pickup truck south on a highway in the City of Ladysmith. He signaled a turn into a gas station, but changed his mind and did not make the turn. Pfalzgraf turned off the highway, used side streets to turn in the opposite direction, and got back onto the highway heading north. Defendant deputy Ben Reisner had noticed Pfalzgraf's change of direction and decided to follow Pfalzgraf's truck. The truck's rear license plate was covered with snow that had accumulated on the bumper, which violated Wisconsin law. Reisner initiated a traffic stop based on the obstructed license plate.

The stop and the events following it were recorded on Reisner's body worn camera. Reisner approached Pfalzgraf from the driver's side of the truck, where Pfalzgraf was holding his driver's license out the window. Reisner said he pulled him over "because your license plate is covered with snow." Dkt. 13, ¶ 5 (Reisner body camera 0:10–0:15). Pfalzgraf replied, "You're going pretty fast for that." Reisner explained that the reason he followed Pfalzgraf was because he had seen Pfalzgraf going southbound and then almost immediately going back northbound and it "seemed kind of odd to me and I wanted to ask you about that." *Id.* (0:16–0:45). Reisner asked where Pfalzgraf was going and Pfalzgraf responded that he "didn't want to go that way

anymore" and had "turned around to go back to [his] house." *Id.* (0:44–0:47). In response to follow up questions from Reisner, Pfalzgraf said that he was coming from his house and, when Reisner asked, "From your house to your house?" Pfalzgraf added "Yeah. Coming to town to buy cigarettes." *Id.* (0:0:48–0:54). Reisner asked where Pfalzgraf lived and remarked that Pfalzgraf's explanation "seems a little odd" before taking Pfalzgraf's license and insurance information and heading back to his squad car. *Id.* (1:12–2:34).

As Reisner walked back to his patrol car, he turned to Pfalzgraf's truck and scraped the snow off the license plate. *Id.* (2:50–3:08). Once the numbers on the license plate were visible, Reisner called dispatch on his portable radio and asked for them to run Pfalzgraf's car and license numbers. *Id.* (3:15–3:45). A second officer arrived on the scene. A few seconds after Reisner radioed dispatch, the second officer walked up to the front of Reisner's car, and Reisner told the second officer that he suspected Pfalzgraf was engaged in drug crime, saying, "961 something going on here." *Id.* (4:00–4:04).[2] As he filled in the other officer on the details of what had happened thus far into the stop, Pfalzgraf could be seen leaning over to the passenger side of the truck cab, and Reisner remarked that Pfalzgraf was "pretty irritated." *Id.* (4:44–4:48).

Reisner then returned to the driver's side window of the truck and asked Pfalzgraf to step outside so that he could ask him some more questions. Reisner asked if Pfalzgraf had a pocketknife or anything on him; Pfalzgraf said he did not. Reisner told Pfalzgraf that he was going to pat him down, "for my safety," and performed a brief frisk of Pfalzgraf's clothing. *Id.* (5:28–6:10). Reisner then questioned Pfalzgraf about why he seemed agitated and had decided

---

[2] The Wisconsin statutory chapter on controlled substances is 961. *State v. Hogan*, 2015 WI 76, ¶ 16, 364 Wis. 2d 167, 178, 868 N.W.2d 124, 129.

to turn around when he did. *Id.* (6:10–11:10). Pfalzgraf said he came to town to get cigarettes and decided not to because there were four squad cars at the gas station. Reisner asked why Pfalzgraf wanted to avoid police, to which Pfalzgraf responded that he wanted to avoid an interaction like the one he was having with Reisner but that he did not have a problem with police. Reisner continued to question Pfalzgraf about whether he would pass a field sobriety test or a blood test for drugs. Reisner said he was asking the questions he was asking because of what he had observed of Pfalzgraf. Reisner then asked him whether it was normal for him to be up at that time of night. Pfalzgraf explained that it was because he works twelve-hour shifts in which he has two days on and three days off. Reisner then asked Pfalzgraf if he could search the truck with his K-9, to which Pfalzgraf said yes. Reisner returned Pfalzgraf's license to him and asked him to step aside to allow for a dog sniff of his vehicle.

Pfalzgraf stood with the second officer near the front of Reisner's car while Reisner got his K-9, Boone, out of his squad car. Reisner had Boone perform a sniff of Pfalzgraf's truck. *Id.* (12:30–14:50). Boone did not make a definitive alert to indicate that he detected narcotics. But according to Reisner, Boone changed his behavior in a way that indicated he was picking up the scent of a controlled substance. Dkt. 15 (Reisner Dep. 48:17–49:7). Based on Boone's behavior change, Reisner proposed to search the truck, to which Pfalzgraf consented. Dkt. 13, ¶ 5 (15:25–15:30).

Reisner's search of the truck did not reveal any contraband. Reisner returned to Pfalzgraf and asked if he had anything in his pockets. *Id.* (27:24–27:30) Pfalzgraf said no, and Reisner said "I'm going to take a quick check here." *Id.* (27:30–27:48). Reisner then directed Pfalzgraf to take his hands out of his pockets and to open them. Pfalzgraf had a small plastic bag in one of his hands that contained a crystalline substance that was later confirmed to be

methamphetamine. Reisner continued a thorough pat down while questioning Pfalzgraf about his drug use. Reisner arrested Pfalzgraf for possession of methamphetamine and operating a vehicle under the influence of a controlled substance.

Pfalzgraf was charged in state court, but he moved to suppress the evidence found during the traffic stop on the grounds that Reisner's conduct violated the Fourth Amendment. The state prosecutor joined the motion to suppress and decided to drop the charges. Pfalzgraf brought this suit seeking to recover damages against Reisner under 42 U.S.C. § 1983.

The court will discuss additional facts when they are relevant to the analysis.

ANALYSIS

The Fourth Amendment prohibits unreasonable searches and seizures. Temporary detentions, including traffic stops, are seizures. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Pfalzgraf concedes that Reisner lawfully detained him for the traffic violation of driving with an obstructed license plate. But Pfalzgraf contends that Reisner violated his Fourth Amendment rights by (1) extending the traffic stop to investigate illegal drug activity after he had resolved the obstructed license plate violation, (2) frisking Pfalzgraf for weapons, and (3) searching Pfalzgraf after a search of his truck did not turn up any evidence of a drug crime.

The court evaluates the parties' motions under the familiar summary judgment standards, which provide that summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391–92 (7th Cir. 2011). The court construes the evidence, and all inferences that reasonably can be drawn from the evidence, in the light

most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The standard is the same on cross motions for summary judgment: the court evaluates each motion independently, viewing the evidence in favor of the non-moving party. *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991). But in "rare circumstances when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

Because Reisner asserts qualified immunity, Pfalzgraf must show not only that Reisner violated his rights, but also that his rights were clearly established at the time. Pfalzgraf can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; or (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). In cases like this one in which the general constitutional rule is clearly established, the question of whether there is a Fourth Amendment violation is sometimes phrased as whether there was "arguable reasonable suspicion." Arguable reasonable suspicion is established "when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that [reasonable suspicion or] probable cause existed in light of well-established law.'" *Minett v. Overwachter*, 433 F. Supp. 3d 1084, 1092 (W.D. Wis. 2020) (citing *Fleming v. Livingston County, Illinois*, 674 F.3d 874, 880 (7th Cir. 2012)). In deciding whether a defendant is entitled to qualified immunity on a motion for summary judgment, the court must decide whether the defendants violated the plaintiff's clearly established rights when the evidence is viewed in the light most favorable to the plaintiff. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v.*

*Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). If the material facts are undisputed, analysis of Fourth Amendment "reasonableness is a pure question of law." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

## A. Extension of the traffic stop to investigate a possible drug crime

The parties agree that Reisner lawfully stopped Pfalzgraf for having snow obstructing his license plate. But Reisner continued the traffic stop after removing the snow from Pfalzgraf's license plate, which Reisner contends resolved the traffic violation for which Pfalzgraf was lawfully detained.

A traffic stop that is lawful at its inception can violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (citations omitted). A traffic violation provides reasonable suspicion for an officer to make a seizure to address the traffic violation and related safety concerns; but the officer's authority to continue the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). At that point, an officer must have reasonable suspicion of illegal activity separate from the traffic violation to justify detaining the individual. *Id.* at 355.

Pfalzgraf contends that by the time Reisner asked him to get out of the truck, Reisner had completed all tasks related to the obstructed license plate violation. And at that point Reisner did not have reasonable suspicion to justify investigating a possible drug crime.

Reisner contends that the traffic mission was not complete, because "Deputy Reisner initiated the K-9 sniff before Dispatch had responded to him about his request for information on Plaintiff." Dkt. 11, at 18. This contention is unsupported by evidence. Reisner's proposed

facts do not contain any information about when dispatch responded to Reisner's inquiry, and Reisner does not cite any evidence to support his assertion that dispatch responded to him after he started the K-9 sniff. During his deposition, Reisner testified that he reapproached Pfalzgraf's truck *after* he finished running Pfalzgraf's license. Dkt. 15 (Reisner Dep. 34:22–24). So the court concludes that it is undisputed that the tasks related to the obstructed license plate traffic violation were resolved before Reisner asked Pfalzgraf to step out of his car for further questioning.

Reisner contends that he did not unlawfully extend the traffic stop for two reasons. First, Reisner contends that the mission of the traffic stop included investigating Pfalzgraf's "suspicious driving pattern" and that that mission had not concluded when he asked Pfalzgraf to step out of his truck for further questioning. Dkt. 26, at 9. Second, Reisner further contends that, even if Pfalzgraf's driving did not provide a basis for a traffic stop to investigate possible impaired driving, Reisner's interactions with Pfalzgraf gave him reasonable suspicion of a drug crime that justified further investigation.[3]

### 1. Pfalzgraf's driving behavior

Reasonable suspicion exists if a deputy has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)).

---

[3] Reisner also contends that he did not unlawfully extend the traffic stop for Boone's sniff of Pfalzgraf's truck because Pfalzgraf consented to the search. Dkt. 11, at 18–19; Dkt. 23, at 13–14. Pfalzgraf concedes that the dog sniff and search of the car were lawful because he gave consent to the search, but he contends that Reisner unlawfully extended the search *before* Pfalzgraf consented to the searches. Dkt. 28, at 7. Pfalzgraf's later consent is irrelevant to whether Reisner had reasonable suspicion to justify an investigation of impaired driving when he asked Pfalzgraf to step out of his truck.

Conduct that is by itself lawful may contribute to reasonable suspicion, but officers must "refrain from using criteria so broad as to subject 'a very large category of presumably innocent travelers' to 'virtually random seizures.'" *Id.*, at 435 (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). A court "need not accept all of an officer's proffered justifications at face value." *Rodriguez-Escalera*, 884 F.3d at 669. The "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and when evaluating reasonable suspicion, courts must consider the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Reisner contends that, when he stopped Pfalzgraf for having an obstructed license plate, "his mission included investigating [Pfalzgraf]'s suspicious driving pattern" and that his questions about Pfalzgraf's driving pattern were necessary to determine if Pfalzgraf was driving while intoxicated. Dkt. 11, at 17; Dkt. 26, at 9. To be sure, "travel-plan questions ordinarily fall within the mission of a traffic stop," *Cole*, 21 F.4th at 430, and an officer may ask questions unrelated to the traffic stop if the questioning does not prolong the stop, *United States v. Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022). But this does not mean that continuing to question a driver about travel plans will always be within the mission of the stop. *Cole*, 21 F.4th at 430 (explaining that the court's holding that routine questions about travel plans ordinarily falling within the mission of a traffic stop "does not mean. . . that officers have a free pass to ask travel-plan questions until they are subjectively satisfied with the answers").

But reasonable suspicion requires that an officer "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Wardlow*, 528 U.S. at 123–24 (2000) (citing *Terry*, 392 U.S. at 27). Viewed objectively, Pfalzgraf's "random driving" was nothing more than a driver using side streets to change direction from south to north. "There

is nothing inherently unlawful or suspicious about a vehicle . . . exiting the highway." *United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002). There is no evidence that Pfalzgraf's turn was sudden or reckless or that he was otherwise driving erratically.[4]

One possible explanation for Pfalzgraf's change of direction is that he was trying to avoid interacting with the police. That impulse is not uncommon, and Pfalzgraf later confirmed that he was trying to avoid police contact. But there are many other benign reasons that could have prompted his decision to change directions on a highway. Pfalzgraf could have simply missed his turn earlier and needed to turn around to get to where he was going. He could have realized that he had forgotten something at home and decided to go back to get it. In short, Pfalzgraf's change of direction was a normal driving maneuver consistent with everyday travel. *See United States v. Neff*, 681 F.3d 1134, 1142 (10th Cir. 2012) (holding that a defendant's decision to exit upon seeing signs for a police checkpoint ahead and then turn around in a driveway could be interpreted as evasive, but it did not rise to the level of reasonable suspicion because in the totality of circumstances the "conduct confirmed to the patterns of everyday travel").

---

[4] During his deposition, Reisner asserted that he had previously seen Pfalzgraf's truck at a residence within his jurisdiction that was known to be a place where drug trafficking occurred, although he had never interacted with Pfalzgraf before. Dkt. 15 (Reisner Dep. 27:13–28:8). Reisner did not mention this observation during the traffic stop or in his incident report about Pfalzgraf's arrest. Reisner cites this fact in a list of circumstances relevant to reasonable suspicion, Dkt. 26, at 11, but he does not explain when he realized that he recognized the truck or otherwise analyze how it related to the reasonable suspicion analysis in this case. Without additional details about when Reisner had previously seen the truck, why he thought it was connected to a residence associated with drug trafficking, and at what point he recognized it, Reisner's claimed recognition of the truck provides no support for reasonable suspicion.

When Reisner decided to follow Pfalzgraf, Reisner had an "inkling" that Pfalzgraf did not want a cop behind him. Dkt. 15 (Reisner Dep. 12:23–13:7). Reisner's hunch that Pfalzgraf was involved in drug activity was proven correct. But reasonable suspicion requires more than a hunch, and the stop cannot be justified based on the eventual results of the search. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Pfalzgraf's driving behavior did not provide reasonable suspicion to justify a traffic stop for the purpose of investigating Pfalzgraf for possible drug use.

### 2. Pfalzgraf's behavior during the traffic stop

Reisner contends that his interactions with Pfalzgraf during their initial discussion provided additional information that gave rise to reasonable suspicion that Pfalzgraf was operating under the influence of a controlled substance. These additional facts are that (1) Pfalzgraf had an agitated demeanor and provided confusing answers to Reisner's questions about where he was driving, (2) it sounded like Pfalzgraf had a dry mouth, and (3) Reisner believed that Pfalzgraf's pupils were dilated and not responding to Reisner's flashlight, which Pfalzgraf was avoiding.

An individual's demeanor can be relevant to whether there is reasonable suspicion of criminal activity. *Rodriguez-Escalera*, 884 F.3d at 669. But "[m]ost people, when confronted by a police officer, are likely to act nervous," so an officer's subjective observations about an individual seeming nervous are not dispositive. *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013) (collecting cases). The body camera footage shows that Pfalzgraf appeared to be displeased about Reisner having pulled him over for a minor traffic violation. And he provided short answers to Reisner's questions that did little to explain his change of direction.

11

Dkt. 13, ¶ 5 (0:12–2:30). The footage also shows that Pfalzgraf politely answered Reisner's questions and complied with his directions.

Pfalzgraf's agitation at being pulled over doesn't support reasonable suspicion because there are many benign reasons that a person who has been followed and then pulled over by an officer could be agitated by the interaction. *See State v. Hogan*, 2015 WI 76, ¶ 50, 364 Wis. 2d 167, 187, 868 N.W.2d 124, 133 ("police cannot expect to conduct field sobriety tests on every motorist who is shaking and nervous when stopped by an officer"); *see also Neff*, 681 F.3d at 1142 (reasoning that the driver's "startled look" upon seeing the police added "little value to the equation" because it was consistent with behavior that would be expected of a substantial portion of innocent travelers).

Reisner's observation that Pfalzgraf's "voice and mouth were dry" is unsupported. Reisner provided no explanation in his deposition, Dkt. 15 (Reisner dep. 30:9–10), and Reisner himself said on during the traffic stop that he did not know Pfalzgraf "from a hole in the ground." Dkt. 13, ¶ 5 (6:20–6:24). Reisner had no idea what Pfalzgraf's voice normally sounded like, so he had no basis to conclude that his mouth was dry or that it indicated drug use.

Reisner asserts that Pfalzgraf was attempting to keep his hat low and avoid having Reisner's flashlight in his eyes and that his pupils did not respond to his flashlight. But the body camera footage contradicts Reisner's assertions. *Id.* (0:12–2:30). Pfalzgraf is wearing a hat, but it is not pulled low over his eyes and he looks straight at Reisner when he answers his questions. Pfalzgraf did look down when Reisner asked for his insurance and shined the flashlight into the truck. But at that point, Pfalzgraf was looking down at the papers he was sorting through to find his insurance, not avoiding Reisner's flashlight. Reisner's conclusory

12

assertion that Pfalzgraf seemed to have a dry mouth and dilated pupils is not an objective basis for reasonable suspicion.

The court concludes that Reisner did not have reasonable suspicion to extend the traffic stop to investigate drug activity when he directed Pfalzgraf to get out of his car to answer more questions about his conduct. This means the court must address Reisner's argument that he is entitled to qualified immunity because he had arguable reasonable suspicion to justify extending the traffic stop.

The constitutional principle here is clear: an officer may not prolong a traffic stop to investigate a suspected drug crime unless the officer has reasonable suspicion that would independently justify a seizure. *See Rodriguez-Escalera*, 884 F.3d at 668 (discussing the rule set out by the Supreme Court in *Rodriguez,* 575 U.S. at 355–58). Thus, the dispositive question for qualified immunity in this case is whether a reasonable officer could have believed that there was reasonable suspicion that Pfalzgraf was possibly driving while intoxicated. Pfalzgraf contends that the decisions in *Hogan*, 2015 WI 76, and *Rodriguez-Escalera*, 884 F.3d 661, clearly established that the circumstances in this case did not provide reasonable suspicion to investigate Pfalzgraf for a drug crime.

The facts of *Rodriguez-Escalera* are not closely analogous to those of this case. But *Hogan* involved a traffic stop with similar circumstances. In *Hogan*, the officer lawfully stopped the defendant for not wearing a seatbelt and "observed what he believed to be indicia of the defendant's drug use" during his initial interactions with the defendant. 2015 WI 76, ¶ 2. A local officer arrived who said that his department had received tips that the defendant was involved in methamphetamine production. *Id.* ¶ 3. The first officer extended the stop to conduct sobriety tests, which did not show signs of impairment. *Id.* ¶¶ 17–19. Defendant

13

subsequently consented to a search of his vehicle, which revealed drugs and guns. *Id.* ¶¶ 21–23. In response to a motion to suppress, prosecutors relied only on the officer's observations about the defendant's pupil size and nervous demeanor as the basis for reasonable suspicion. *Id.* ¶ 41. The Wisconsin Supreme Court affirmed the trial court's decision that there was not reasonable suspicion based on those observations. The court reasoned that the officer did not have information about how drug use would affect pupil size during the stop and that the defendant's demeanor was insufficient to establish reasonable suspicion that the defendant had used methamphetamine because there were innocent explanations for a driver to be nervous and shaking when stopped by an officer. *Id.* ¶¶ 48–50.

Reisner's observations about Pfalzgraf's pupil size, agitated demeanor, and terse answers to Reisner's questions are the same characteristics that the court in *Hogan* concluded were insufficient to establish reasonable suspicion. The additional factor that Reisner contends distinguishes this case from *Hogan* is Pfalzgraf's change in direction on the highway when Reisner began following him. But nothing about Pfalzgraf's driving suggested he was intoxicated, and a driver's decision to change direction is the type of "commonplace behavior that could subject people to virtually random seizures if" it was sufficient to establish reasonable suspicion. *Taylor v. Schwarzhuber*, 132 F.4th 480, 488 (7th Cir. 2025) (citing *Reid*, 448 U.S. at 441); *see also Yousif*, 308 F.3d at 827–28 (officers did not reasonable suspicion to stop all vehicles who exited the highway after a ruse sign that said police checkpoints were ahead because drivers could wish to avoid a police checkpoint for "wholly innocent reasons").

The court concludes that Reisner did not have even arguable reasonable suspicion to extend the traffic stop to investigate whether Pfalzgraf was driving while intoxicated. The court will deny Reisner's motion for summary judgement and grant Pfalzgraf's motion for summary

judgment that Reisner violated Pfalzgraf's Fourth Amendment rights when he extended the traffic stop to investigate potential drug-related offenses.

## B. Frisk for weapons

Reisner frisked Pfalzgraf approximately five and a half minutes into the traffic stop, when Reisner decided to have Pfalzgraf step out of the car to question him further about whether he was driving while under the influence of a controlled substance.

Officers who temporarily detain an individual must have "a reasonable, 'articulable suspicion that the suspect is armed and dangerous'" to lawfully search the individual for weapons. *Taylor*, 132 F.4th at 489. This "specific analysis, requiring the officer to hold a reasonable suspicion that the subject is 'armed and dangerous' as opposed to being generally suspicious, allows courts to distinguish between legitimate and illegitimate frisks, the latter of which constitute severe intrusions upon individual liberty." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). A frisk "should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *Williams*, 731 F.3d at 686; *see also Mwangangi v. Nielsen*, 48 F.4th 816, 826 (7th Cir. 2022) (explaining that a non-offense-based fear that any driver could have a weapon in their car could not justify a pat down because officers "must be able to point to particular facts supporting an objectively reasonable suspicion that a suspect was armed and dangerous.").

Reisner contends that there was reasonable suspicion that Pfalzgraf may have been armed or posed a danger for two reasons: (1) that Reisner reasonably suspected Pfalzgraf had used or was in possession of drugs, which are closely associated with the presence of guns, and (2) that the stop occurred late at night in a rural county were people often carry concealed

weapons. Dkt. 26, at 4. As for the first of these reasons, any connection between drugs and guns is irrelevant to whether there was reasonable suspicion that Pfalzgraf was armed because Reisner did not at that point have a reasonable suspicion that Pfalzgraf had used or was in possession of drugs.

As for Reisner's concern that Pfalzgraf posed a threat because it was late at night in an area where people commonly carry concealed weapons, the fact that people in the area often have concealed weapons is too general to justify a frisk. "Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Doornbos v. City of Chicago*, 868 F.3d 572, 582 (7th Cir. 2017) (citing *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990)). Reisner's previous experience with residents of Rusk County does not create an individualized suspicion of Pfalzgraf. And if most residents of Rusk County are lawfully armed, that is a characteristic of a general population that cannot give rise to reasonable suspicion. Likewise, the fact that the traffic stop occurred in the middle of the night has no bearing on whether Pfalzgraf was armed or posed a threat to the officers.

The court concludes that Reisner violated Pfalzgraf's Fourth Amendment rights when he frisked him for weapons without having reasonable suspicion that Pfalzgraf was armed or dangerous. The court also concludes that this is not a close case in which a reasonable officer could have arguable reasonable suspicion that Pfalzgraf was armed and dangerous. As discussed above, a reasonable officer could not have mistakenly believed there was reasonable suspicion that Pfalzgraf was involved in a drug crime. And no officer familiar with *Williams*, 731 F.3d 678, could have made a good-faith error that a belief about the general behavior of residents in a county provided individualized suspicion that Pfalzgraf was armed.

The court will deny Reisner's motion for summary judgment on this claim and grant summary judgment to Pfalzgraf that Reisner violated his Fourth Amendment rights by frisking him for weapons without reasonable suspicion that he was armed and dangerous.

## C. Second search of Pfalzgraf's person

Warrantless searches of an individual are "per se unreasonable under the Fourth Amendment" unless certain "well-delineated exceptions apply." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is when the officer has probable cause that a crime has been committed and exigent circumstances would make securing a warrant for the search impractical. *Missouri v. McNeely*, 569 U.S. 141, 156 (2013).

Here, Reisner contends that his direction to Pfalzgraf to remove his hands from his pockets was not a search and that once the baggie of drugs was visible in Pfalzgraf's hand there was probable cause to conduct a more thorough search. Reisner also contends that there was probable cause to conduct a second search of Pfalzgraf because Boone alerted to the scent of narcotics.

The court concludes that Reisner's direction to Pfalzgraf to remove his hands from his pockets and show what was inside them was a search. "[A]n officer can initiate a frisk before physically touching a person." *Doornbos*, 868 F.3d at 581–82; *see also United States v. Foust*, 461 F.2d 328, 330 (7th Cir. 1972) (holding that the defendant was searched when an officer "directed the defendant to empty his pockets onto a nearby table"). When Reisner approached Pfalzgraf after searching his truck, Reisner asked, "Got anything in your pockets?" before saying "Let me take a quick check here" and instructing Pfalzgraf to "Take your hands out of your pockets for me," "Open up your hand," "Put both your hands out," and to "turn them right

17

side up." Dkt. 13, ¶ 5 (27:20–27:27:35). Reisner contends that he did not search Pfalzgraf because he "verbally asked him to take his hands out of his pockets" and "asking a suspect to remove their hands from their pockets is not a search." Dkt. 23, at 15 (citing *United States v. Weaver*, 9 F.4th 129, 144 (2d Cir. 2021)). But Reisner's instructions were not merely a request for Pfalzgraf to take his hands from his pockets. Reisner ordered Pfalzgraf to show his hands and then reveal what was inside of them. Reisner gave those orders almost 30 minutes into a traffic stop in which he had already searched Pfalzgraf for weapons and searched his truck for contraband. Under these circumstances, Reisner's instructions that Pfalzgraf remove his hands from his pockets and open them face up was a search.

As for Reisner's contention that he had probable cause for this search based on Boone's behavior, it is well-established that an alert by a K-9 trained to detect narcotics can provide probable cause to search a vehicle. *Florida v. Harris*, 568 U.S. 237, 247–48 (2013).[5] But whether a K-9's alert to a vehicle provides probable cause to search a person who was outside the vehicle at the time of the dog sniff is a separate question for which courts have reached different answers in different circumstances. *Compare State v. Theobald*, 2024 WI App 1, ¶¶ 11–12, 2 N.W.3d 413 (holding that officers lacked probable cause to search a driver's person when the information "at the time of the search was that the K-9 had alerted to the driver's door of an empty car and that a search of the car resulted in no evidence of drugs or contraband"), *with United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) (holding that a K-9's alert to

---

[5] Reisner also contends that an empty cylindrical container that he found in Pfalzgraf's truck was additional evidence supporting probable cause because it is the type of container that people commonly use to store glass methamphetamine pipes. Dkt. 11, at 22. Without other evidence of drug activity, the empty cylindrical container does not establish probable cause to search Pfalzgraf's person.

a car that did not contain contraband provided probable cause to search the occupants because "[e]ven if the subsequent fruitless search of the car diminished the probability of contraband being in the car, it increased the chances that whatever the dog had alerted to was on the defendants' bodies").

More important in this case, Pfalzgraf disputes whether Boone even alerted to his truck. Dkt. 20, at 3; Dkt. 25, ¶ 65; Dkt. 29, ¶ 67. Reisner testified that he "felt there that was a potential odor source inside the vehicle" because Boone's behavior changed in a way that Reisner perceived as Boone detecting "the odors he's imprinted on" based on Reisner's "experience and training with him." Dkt. 15 (Reisner Dep. 48:19–49:7). But Reisner admitted that Boone did not make a "final alert response that he had located an odor." *Id.* If Boone did not alert, then there is no arguable probable cause to justify the second search of Pfalzgraf's person. Whether Boone's behavior change constitutes an alert to the presence of narcotics is a question of fact, which the court cannot resolve at summary judgment.

Pfalzgraf contends that even if the court assumes that Boone's sniff was an alert, in the circumstances of this case that is insufficient to establish probable cause to search his person. The court agrees. The existence of probable cause to search an automobile does not automatically mean that there is probable cause for other warrantless searches. *Collins v. Virginia*, 584 U.S. 586, 595 (2018); *see also United States v. Di Re*, 332 U.S. 581, 587 (1948) (holding that a person does not lose "immunities from search of his person to which he would otherwise be entitled" by his "mere presence in a suspected car"). Pfalzgraf was not in or near his truck when Boone changed behavior during the sniff, and the other circumstances of the stop did not provide a reasonable suspicion that Pfalzgraf had drugs on his person. Under the

19

totality of circumstances, a final alert from Boone to Pfalzgraf's truck would not have provided probable cause to search Pfalzgraf's person.

But the court concludes that, if Boone had alerted to Pfalzgraf's truck, a reasonable officer could think there was probable cause to search Pfalzgraf himself. On the merits of his probable cause argument, Reisner contends that the absence of contraband in the truck made it more likely that Pfalzgraf had contraband on his person. Dkt. 26, at 16–17 (citing *Brown v. Kazmierski*, No. 17-CV-525, 2020 WL 4904056, at *3 (E.D. Wis. Aug. 20, 2020), *aff'd*, 860 F. App'x 444 (7th Cir. 2021) and *Anchondo*, 156 F.3d at 1045). These cases are too factually dissimilar to persuade the court that Boone's alert on an empty car would be sufficient to establish probable cause to search Pfalzgraf under the circumstances of this case. In *Brown*, the K-9 alerted to drugs that were found inside the vehicle before the officer conducted a search of the passenger's person. 2020 WL 4904056, at *3. In *Anchondo*, the K-9 first alerted to the exterior of the vehicle while the defendant was inside it and then alerted to the inside of the vehicle while the defendant was outside of it. 156 F.3d at 1044. But these cases do show that a reasonable officer could mistakenly believe a K-9 alert to a vehicle provides probable cause to search someone who had just been in that vehicle.

This means that if Boone did alert to Pfalzgraf's vehicle, Reisner is entitled to qualified immunity on Pfalzgraf's claim concerning the second search of his person. The court will deny both parties' motions for summary judgment on this claim because it depends on a factual dispute that will have to be decided by the jury.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 10, is DENIED.

2. Plaintiff's motion for partial summary judgment, Dkt. 16, is GRANTED in part as follows:

   a. Plaintiff is entitled to summary judgment on his claim concerning unlawful extension of the traffic stop.

   b. Plaintiff is entitled to summary judgment on his claim concerning the initial frisk for weapons.

   c. Plaintiff is not entitled to summary judgment on his claim concerning the second search of his person.

3. The parties' joint motion to strike the trial date, Dkt. 31, is DENIED.

4. The case will proceed to trial on liability for plaintiff's claim concerning the second search and on damages.

Entered April 11, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge